RECEIVED

NOV 18 2021

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.,* Sarah Sweeney, and SARAH <br> SWEENEY, an individual <br><br> Plaintiffs, <br><br> v. <br><br> BEST FOOT FORWARD CORPORATION <br> PODIATRIC SPECIALISTS, and FRANKLIN <br> W. HARRY, <br><br> Defendants. | **4:21CV01366 JCH** <br><br> Civil Action No. <br><br> JURY TRIAL DEMANDED <br><br> **FILED UNDER SEAL** |

## COMPLAINT

On behalf of the United States of America, and individually, Relator/Plaintiff Dr. Sarah

Sweeney ("Relator"), for its and her Complaint against Defendants Best Foot Forward

Corporation Podiatric Specialists ("BFF") and Dr. Franklin W. Harry, hereby states as follows:

## THE PARTIES

1.      Relator brings this action on behalf of the United States of America against

Defendants for treble damages and civil penalties arising from Defendants' false statements and

false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* The violations

arise out of billing for medically unnecessary procedures administered to patients insured by

government payors and submitting claims for payment while in noncompliance with the

Medicare conditions of participation.

2.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relator has

provided to the Attorney General of the United States and to the United States Attorney for the

Eastern District of Missouri a statement of all material evidence and information related to this

Complaint. This disclosure statement is supported by material evidence known to Relator at the

1

time of filing, establishing the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

3.      Relator is a citizen of the United States and a resident of the State of Missouri.

4.      Relator brings this action based on her direct, independent, and personal knowledge.

5.      Relator is an original source of this information to the United States. She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government included in this action under the False Claims Act, which is based on this information.

6.      Relator signed an employment contract with Defendants on February 16, 2021. Relator worked for Defendants until she resigned on August 26, 2021.

7.      Relator also brings this action on her own behalf against Defendants alleging myriad violations of state and federal law in regard to her employment.

8.      Defendant BFF is a Missouri corporation providing podiatric services and an employer within the meaning of the Missouri Human Rights Act ("MHRA"), R.S.Mo. § 213.010(7), the Fair Labor Standards Act ("FLSA") and the Equal Pay Act ("EPA"), 29 U.S.C. § 203(d), and under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(5).

9.      Defendant Harry is an individual, residing in Missouri, who is the owner of BFF. He is an employer within the meaning of the FLSA and the EPA, 29 U.S.C. § 203(d), and under

ERISA, 29 U.S.C. § 1002(5) because he controlled the daily operations of BFF, supervised

Relator and otherwise acted directly in the interest of BFF in relation to Relator.

## JURISDICTION AND VENUE

10.     This action arises in part under the False Claims Act, 31 U.S.C. §§ 3729 and

3730. This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a)

and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

11.     This Court also has jurisdiction over Relator's employment causes of action

against Defendants pursuant to ERISA, 29 U.S.C. §§ 1131 and 1140, *et seq.,* FLSA, 29 U.S.C.

§201, *et seq.,* the Equal Pay Act, 29 U.S.C. §§ 206(d)(1), 216(b), and 28 U.S.C. §1387 for

ancillary State law claims. This Court has personal jurisdiction over BFF because it is organized

and existing under the laws of the State of Missouri.

12.     This Court has personal jurisdiction over Harry because, on information and

belief, he is a resident of the State of Missouri. In addition, the acts herein complained of were

engaged in by Harry in the State of Missouri.

13.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts

proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein took place in this District, and

is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant,

Defendants transact and transacted business in this District.

## THE FALSE CLAIMS ACT

14.     The False Claims Act ("FCA") 31 U.S.C. § 3729 *et seq.* provides, in pertinent

part:

(a) Any person who (A) knowingly presents, or causes to be presented, a false or

    fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be

    made or used, a false record or statement material to a false or fraudulent claim . . . is

3

liable to the United States Government for a civil penalty of not less than $5,000 and

not more than $10,000 . . . plus 3 times the amount of damages which the

Government sustains because of the act of that person.

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a

person, with respect to information (1) has actual knowledge of the information; (2)

acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in

reckless disregard of the truth or falsity of the information, and no proof of specific

intent to defraud is required.

15.    For the purposes of the FCA, "person," includes corporations. *Cook County, Ill. v.*

*United States ex rel. Chandler*, 538 U.S. 119, 125 (2003).

16.    "Material," within the context of the FCA, means "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

§ 3729(b)(4).

17.    The False Claims Act recognizes two types of claims—factually false claims and

legally false claims. Factually false claims generally involve claims that a government payee has

submitted an incorrect description of goods or services provided or a request for reimbursement

for goods or services never provided. *U.S. ex rel. Fields v. Bi-State Dev. Agency of the Missouri-*

*Illinois Metro. Dist.*, No. 4:14 CV 1321 RWS, 2015 WL 5158398, at *8 (E.D. Mo. Sept. 2,

2015). Claims of legal falsity, on the other hand, allege that the defendant has certified

compliance with a statute or regulation as a condition to government payment, yet knowingly

failed to comply with such statute or regulation. *Id.*

18.     A claim is false or fraudulent on the basis of implied certification when noncompliance with regulations is material to the Government's decision to reimburse the claims. *See Universal Health Servs., Inc. v. U.S.*, 136 S. Ct. 1989, 1996 (2016).

19.     The FCA also proscribes retaliatory actions taken by an employer against a relator because of the relator's actions in an effort to prevent or stop violations of the act. 31 U.S.C. § 3730(h).  This protection extends to internal reporting of fraudulent activity.

20.     Conspiracy to present false or fraudulent claims to the United States for payment or approval is another basis for liability under the FCA. 31 U.S.C. § 3729(a)(1)(C).

## FACTS COMMON TO ALL COUNTS

### A. The Medicare Program

21.     The Medicare program was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395 *et seq*., to provide a federally funded insurance program for the aged and disabled.

22.     During the relevant time period, the United States administered and funded Medicare, pursuant to the Social Security Act. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicare. In order to receive Medicare funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

23.     The Centers for Medicare and Medicaid Services ("CMS") is an agency of the United States Department of Health and Human Services ("HHS") and is responsible for the administration of the Medicare Program.

5

24.     Medicare consists of two basic parts: Part A (42 U.S.C. §§ 1395c–1395i-6) and Part B (42 U.S.C. §§ 1395j–1395w-6).

25.     Regardless of the Part of Medicare that applies, under the program payments may only be made for items and services that are reasonable and necessary for the diagnosis or treatment of illness or injury. 42 U.S.C. § 1395y(a)(1)(A).

26.     Medicare Advantage Plans are offered by private companies that contract with Medicare and fall under Medicare Part C. These plans cover all Part A and Part B benefits. Medicare Advantage Plans include: Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Private Fee-for-Service Plans

**B. The Medicaid Program**

27.     Title XVIII of the Social Security Act, 42 U.S.C. § 1396, et seq. established Medicaid, a federally assisted grant program for the States. Medicaid enables states to provide medical assistance and related services to needy individuals. The Centers for Medicare and Medicaid Services ("CMS") Administers Medicaid on the federal level. The State must first submit a State plan giving assurance that its Medicaid program will be administered in conformity with federal requirements. 42 C.F.R. § 430.10. CMS then makes a determination whether the plan can be approved to serve as a bases for Federal financial participation in the State program. *Id*. Once CMS has approved a State plan, it makes quarterly grant shares to the State to cover the Federal share for services, training, and administration. 42 C.F.R. § 430.30. Within broad federal rules, each state decides who is eligible for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

28.     During the relevant time period, the United States provided funds to the Missouri Medical Assistance Program (Medicaid) under Title XIX of the Social Security Act, 42 U.S.C. §

6

1396 et seq. Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

29.     Medicaid in Missouri is called "Mo HealthNet." Mo. Rev. Stat. § 208.001.2. The division of Missouri state government responsible for promulgating Medicaid regulations is Mo HealthNet Division. *Id.*

30.     To become an enrolled Medicaid provider in Missouri, eligible providers must submit an application through the Missouri HealthNet Division of the Department of Social Services.

31.     Records must be retained for five (5) years from the date of service. Fiscal and medical records coincide with and fully document services billed to the MO HealthNet Division. Failure to furnish, reveal, or retain adequate documentation for services billed to the MO HealthNet rehabilitation center program, is a violation of this regulation. Mo. Code Regs. tit. 13 § 70-65.010.

32.     Adequate documentation means documentation from which services rendered and the amount of reimbursement received by a provider can be readily discerned and verified with reasonable certainty. Mo Code. Regs. Tit. 13 §70-3.030.

33.     Adequate medical records are records which are of the type and in a form from which symptoms, conditions, diagnosis, treatments, prognosis, and the identity of the patient to which these things relate can be readily discerned and verified with reasonable certainty. *Id.*

34.     An organization must comply with all applicable Federal, State, and local laws and regulations in order to participate in the Medicaid program. 42 C.F.R. § 485.707.

**C. Foot Care Services**

35.     Services related to routine foot care, such as the cutting or removal of calluses, trimming of nails, routine hygienic care, or any service performed in the absence of a localized illness, injury, or symptoms involving the feet are excluded from coverage under Medicare. 42 C.F.R. § 411.15(l)(1)(i).

36.     However, these services are not excluded from coverage if they are furnished as incident to, or at the same time as, or as a necessary integral part of a primary covered procedure performed on the foot. 42 C.F.R. § 411.15(l)(2)(iii)(A).

37.     The treatment of mycotic toenails may also be covered if furnished no more often than every 60 days or the billing physician documents the need for more frequent treatment. 42 C.F.R. § 411.15(l)(2)(ii).

38.     The treatment of fungal (mycotic) infection of the nails is a covered service when the medical record substantiates clinical evidence of mycosis of the nail, by generally accepted clinical findings such as discoloration, onycholysis, subungual debris, thickening, or secondary skin infection. CMS, Dep't of Health & Human Servs, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 15, § 290 (Rev. 1).

39.     In addition, it must be documented that the patient suffers from pain or secondary infection resulting from the thickening and dystrophy of the infected toenail plate(s). *Id.*

8

40.     Documentation means any written information that is required by the Part A and/or Part B Medicare Administrative Contractor ("A/B MAC") in order for services to be covered. *Id*. The information submitted with claims must be substantiated by information found in the patient's medical record. *Id*.

41.     Any information, including that contained in a form letter, used for documentation purposes is subject to A/B MAC verification in order to ensure that the information adequately justifies coverage of the treatment of mycotic nails. *Id*.

42.     The treatment of mycotic nails may also be covered in the presence of systemic conditions such as metabolic, neurologic, and peripheral vascular diseases. CMS, Local Coverage Article, Billing and Coding: Foot Care (A56232), available at https://www.cms.gov/medicare-coverage-
database/view/article.aspx?articleid=56232&ver=18&bc=CAAAAAAAEAAA&=

43.     In evaluating whether the routine services can be reimbursed, a presumption of coverage may be made where the evidence available discloses certain physical and/or clinical findings consistent with the diagnosis. CMS, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 15, § 290 (Rev. 1).

44.     The presumption of coverage may be applied when the physician rendering the routine foot care has identified: 1. A Class A finding; 2. Two of the Class B findings; or 3. One Class B and two Class C findings. *Id*.

**D. CPT Procedure and Codes**

45.     Health care providers utilize numerical codes, called Current Procedural Terminology ("CPT") codes, on their claim forms to identify the services provided to the patient.

9

**Group 3 Codes:**

| CODE | DESCRIPTION |
|---|---|
| L02.611 | Cutaneous abscess of right foot |
| L02.612 | Cutaneous abscess of left foot |
| L03.031 | Cellulitis of right toe |
| L03.032 | Cellulitis of left toe |
| L03.041 | Acute lymphangitis of right toe |
| L03.042 | Acute lymphangitis of left toe |
| M79.671 | Pain in right foot |
| M79.672 | Pain in left foot |
| M79.674 | Pain in right toe(s) |
| M79.675 | Pain in left toe(s) |
| R26.2 | Difficulty in walking, not elsewhere classified |

49. The nail debridement procedures are considered non-covered routine foot care when these services do not meet the guidelines for mycotic nail services or are not based on the presence of a systemic condition. *Id.*

50. If the nail debridement procedures are performed in the absence of mycotic nails and as part of foot care, they must meet the same criteria as all other routine foot care services to be considered for payment. *Id.*

51. When an itemized bill shows both covered services and noncovered services not integrally related to the covered service, the portion of charges attributable to the noncovered services should be denied. CMS, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 15, § 290 (Rev. 1).

**E. Diagnosis and Treatment of Diabetic Peripheral Neuropathy**

52. Presently, peripheral neuropathy, or diabetic sensory neuropathy, is the most common factor leading to amputation in people with diabetes. CMS, Medicare Coverage Issues Manual, Transmittal 153, available at https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=171&ncdver=1&bc=BAAAgAAAAAAA&

53.     Long nerves are affected first, with symptoms typically beginning insidiously in the toes and then advancing proximally. *Id*.

54.     This leads to loss of protective sensation (LOPS), whereby a person is unable to feel minor trauma from mechanical, thermal, or chemical sources. *Id*. When foot lesions are present, the reduction in autonomic nerve functions may also inhibit wound healing. *Id*.

55.     Diabetic sensory neuropathy with LOPS is a localized illness of the feet and falls within the regulation's exception to the general exclusionary rule for services related to routine foot care. *Id*.; *see also* 42 C.F.R. § 411.15 (l)(1)(i).

56.     Foot exams for people with diabetic sensory neuropathy with LOPS are reasonable and necessary to allow for early intervention in serious complications that typically afflict diabetics with the disease. CMS, Medicare Coverage Issues Manual, Transmittal 153.

57.     Medicare covers, as a physician service, an evaluation (examination and treatment) of the feet no more often than every six months for individuals with a documented diagnosis of diabetic sensory neuropathy and LOPS. *Id*.

58.     LOPS must be diagnosed through sensory testing with the 5.07 monofilament using established guidelines, such as those developed by the National Institute of Diabetes and Digestive and Kidney Diseases guidelines. *Id*. Five sites should be tested on the plantar surface of each foot, according to the National Institute of Diabetes and Digestive and Kidney Diseases guidelines. *Id*.

59.     As suggested by the American Podiatric Medicine Association, an absence of sensation at two or more sites out of 5 tested on either foot when tested with the 5.07 Semmes-Weinstein monofilament must be present and documented to diagnose peripheral neuropathy with loss of protective sensation. *Id*.

60.    The examination includes: 1) a patient history, and 2) a physical examination that must consist of at least the following elements: a. visual inspection of forefoot and hindfoot (including toe web spaces); b. evaluation of protective sensation; c. evaluation of foot structure and biomechanics; d. evaluation of vascular status and skin integrity; e. evaluation of the need for special footwear; and 3) patient education. *Id*.

61.    Treatment includes, but is not limited to: 1) local care of superficial wounds; 2) debridement of corns and calluses; and 3) trimming and debridement of nails. *Id*.

62.    The diagnosis of diabetic sensory neuropathy with LOPS should be established and documented prior to coverage of foot care. *Id*.

**F.  Foot Care Services Provided to Skilled Nursing Facility ("SNF")**

63.    If a SNF does not employ a qualified professional person to furnish a specific service to be provided by the facility, the facility must have that service furnished to residents by a person or agency outside the facility.  42 C.F.R. § 483.70(g)(1).

64.    Consultation services rendered by a podiatrist in a SNF are covered if the services are reasonable and necessary and do not come within any of the specific statutory exclusions. CMS, Medicare Coverage Issues Manual, Transmittal 153.

**G.  Background of Relator**

65.    Relator was employed as a podiatrist pursuant to a contract with BFF from February 16, 2021, to August 26, 2021.

66.    In that position, Relator worked with another podiatrist, Dr. Franklin Harry, the registered agent and owner of BFF.

**H.  Background of Relevant Organizations**

13

67.     BFF provides outpatient services within its offices as well as on-site foot care for hospitals and long-term living facilities.

68.     Harry is the founder and Registered Agent of BFF.

**I.   Dr. Franklin Harry Provides Uncovered Services and Bills for Services Not Provided**

69.     CPT code G0127 represents the trimming of dystrophic nails. CMS, Local Coverage Article, Billing and Coding: Foot Care (A56232).

70.     CPT code 11720 represents the debridement of 1-5 toenails. *Id*. CPT 11721 represents the debridement of 6 or more toenails. *Id*.

71.     Providing the service of debriding toenails requires more skill, is more expensive, and takes longer than trimming the nails.

72.     Despite only trimming some of the patients' toenails, Harry only billed under code 11721 and falsely represented he performed a debridement of all the patients' nails.

73.     Meanwhile, only about half of Relator's patients would require the services to bill under code 11721.

74.     Harry got upset with Relator for not billing under 11721, although it was not representative of the services provided, because it decreased the reimbursement amount from Medicare.

75.     Harry and Relator provided on-site foot care services at St. Joe Manor, a skilled nursing facility in Bonne Terre, Missouri.

76.     Additionally, Harry is associated with Touchette Regional Hospital and provides services at Archview Medical Center, a federally qualified health center in Sauget, Illinois.

77.     Beginning in or around May of 2021, Harry began phasing out coming into the office. Relator took over all the patients and would review the patients' files before visiting them.

78.     Relator looked back at the patient files that Harry billed 11721 services for and there was no indication of fungus present in the toenails to require debridement.

79.     Relator also realized once she visited the patients on-site that they did not have the chronic conditions Harry claimed to bill certain CPT codes.

80.     Additionally, Harry indicated diabetic patients had neuropathy when they did not. Some patients that supposedly had neuropathy then complained of pain.

81.     Many patients were non-verbal due to dementia, effects of a stroke, or other health related issues, and could not tell Harry whether their feet hurt.

82.     Harry also claimed to have performed drainages of hematomas on certain patients within the nursing home. However, when Relator visited the same patients, there was no sign of the procedure. Relator would have been able to see if the procedure was in fact performed on the patient.

83.     Harry often included in his notes that he discussed hammertoe surgery with patients, or performed a gait analysis on the patients.

84.     Relator does not recall ever seeing Harry perform a gait analysis.

85.     Additionally, many of Harry's patients at the nursing home could not walk.

**J.  Best Foot Forward Does Not Implement Proper Sterilization or Infection Control Practices**

86.     Harry does not utilize proper sterilization practices when providing foot care services, including surgery, to patients.

87.     When Relator began her employment at BFF, Harry did not have an autoclave. An autoclave is a device that uses steam to sterilize equipment and other objects.

88.     Harry continued to not utilize an autoclave for several months during Relator's employment. Harry did not sterilize instruments before performing removal or excision of patients' toenails according to accepted sterilization practices. Instead, Harry placed instruments to be used on patients in improperly mixed solution. Additionally, torniquets that were placed around toes for nail removals under local anesthesia were not sterilized.

89.     Harry did not use sterile gloves while providing foot care services to patients.

90.     BFF did not keep proper records of sterilization of instruments.

91.     BFF did not have a sign indicating that employees must wash hands before returning for work.

92.     Relator informed BFF that she needed sterile drapes, gloves, and kits with instruments that were already sterilized, as BFF did not utilize an autoclave.

**K.  Best Foot Forward Does Not Maintain Required Documentation**

93.     Defendants have not properly kept or maintained proper medical record documentation for at least 7 years.

94.     Patient medical records are not properly organized and are left unsecure in an unlocked drawer in front of Defendants' office.

95.     Defendants do not implement appropriate safeguards in order to protect patients' medical records and sensitive information.

**L.  Harry Prescribes Medically Unnecessary Balance Braces**

96.     Harry also prescribed and billed for medically unnecessary balance braces.

97.     A balance brace is designed to reduce the risk of falls. They are most commonly prescribed for elderly patients. Medicare will cover the cost of a balance brace when it is medically necessary. 42 U.S.C. § 1395x(s)(9).

98.     A common method of determining whether a balance brace is medically necessary is to conduct a gait analysis. A gait analysis is necessary to determine the proper size and fit for a brace.

99.     Harry prescribed and billed for balance braces for patients without conducting a gait analysis. Relator observed Harry on multiple occasions prescribe a balance brace without conducing a gait analysis or proper fitting. This resulted in patients being prescribed balance braces that (1) were not medically necessary or (2) did not fit properly and therefore were painful.

**M. Harry Bills for Additional Treatments Not Provided**

100.    Substantially all of the patients treated by Harry were billed for treatment of a rare condition called a periungual callus. This is in spite of the fact that the patients did not have such calluses and, on information and belief, never had them.

101.    Periungual, or "peri" calluses are thick buildups of tissue occurring around a toenail. Generally, peri calluses are caused by a deformity in the foot or toe that causes a toe to stick up and press on a shoe or other surface for an extended period of time.

102.    Peri calluses are treated by debridement. Debridement is a surgical procedure performed with a curette or a scalpel. Debridement is **NOT** merely scraping skin or debris.

103.    During the course of her employment with Defendants, Relator only treated two peri calluses.

17

104.     Harry would treat a patient by trimming toenails and scraping off detritus that naturally built up under the toenail. Scraping of detritus is not billable. He would then falsely bill CPT 11056 as if he had debrided two calluses.

**N.  Shirking Matrixectomy Global Period**

105.     Partial or total nail avulsion with matrixectomy is a procedure billed with CPT 11750. This procedure is most commonly used on children.

106.     There is a ten day global period after the procedure.

107.     Harry purposely waited for the global period to end after ten days and would instead see the patient after two weeks.

108.     Harry did this so the patient could be billed for the office visit after the global period.

**O.  Sexual Harassment and Retaliation.**

109.     Harry attempted to force Relator into a *quid pro quo* sexual relationship with him.

110.     From the advent of her employment with BFF, Harry made inappropriate remarks to her containing sexual overtones and issued repeated social invitations to her that contained sexual overtones.

111.     Harry texted Relator persistently with requests that she socialize with him after work.

112.     On or about May 25, 2021, when they were supposed to meet in a public location for a business meeting, Harry went home and changed into clothes appropriate for a date, then showed up at Relator's apartment complex uninvited and called her insisting that she come downstairs to have a drink with him.

18

113.    Relator told him she would meet him in a public location instead.  As a result, they compromised and went to dinner together at Mission Taco. Relator refused to get in a car with Harry, and drove separately.

114.    When they met, they did not converse about her work.

115.    When Relator refused other invitations, Harry told her they would have to meet at the office to prepare billing until 2 a.m.  When she then agreed to meet him socially instead, the work requirement went away.  Again, Dr. Harry did not discuss Relator's work at these meetings.

116.    When she continually refused his invitations, Harry retaliated against Relator by establishing false deadlines for her charting, refusing to let her conduct complex surgeries or obtain hospital privileges, complaining about her honest and accurate coding of billing, docking her salary for sick leave, failing to get her credentialed and then docking her salary because she was not credentialed, and refusing to provide her with health insurance benefits that were routinely provided much earlier to other employees.

117.    Harry's conduct also created a pervasive sexually hostile work environment for Relator.

118.    On one occasion, Harry told Relator that women constantly flirted with him when he went out with the office manager, David Liebermann, and when they learned that Harry was married he would pass them off to Liebermann.

119.    Harry constantly quizzed Relator about the sexual aspects of her relationship with her boyfriend.

120.    During a clinical discussion of her disability, Harry told her something to the effect of, "Oh, you have to be super careful when you have sex."

19

121.    One day when she spoke with Harry about a male patient, Harry identified the patient as "the guy with the hot wife," and said the patient needed to keep trim because of his young, hot wife.

122.    In Relator's presence, Harry spoke to the office manager about the sexiness of the female sales representative for skin graft products.  Harry refused to order skin graft products from any other sales representative.

123.    Harry's conduct occurred pervasively throughout Relator's employment.

124.    Multiple medical assistants, all of whom were female, resigned their employment with Defendant.  On information and belief, those resignations were motivated, at least in part, by Defendant's treatment of women, especially Relator.

**P. Gender Discrimination and Unequal Pay.**

125.    All of BFF's medical assistants are women, and the office manager is male. Harry treated the women disparately in terms of compensation and breaks.

126.    Although she was salaried, BFF repeatedly docked Relator's pay because she was not credentialed in Missouri and Illinois.  Relator was qualified to be credentialed and had completed all the necessary paperwork, but BFF was not timely about submitting Relator's paperwork, so she was unable to obtain her credentialing.

127.    Subsequently BFF hired a male physician, Dr. Timur Davidov, whose compensation was never docked, although he was not credentialed.

128.    Although Relator was salaried, BFF also docked her pay when she was absent due to illness, such as when she was absent twice because she was in the intensive care unit due to her mast cell activation condition, when she miscarried, and when she was ill with, and quarantined for, COVID-19.

129.     On information and belief, the male physician Davidov did not have his salary docked for illness.

130.     Although Relator was trained and experienced in complex surgery, Harry assigned her solely to conduct in-office surgery and to handle nursing home visits.

131.     The new male physician had no training or experience in complex surgery, but he was promptly permitted to conduct surgery at Touchette Hospital and did not get assigned to the nursing homes.

132.     Harry spoke down to Relator, but not to the male physician.  Harry frequently asked Relator, "do I make myself clear?" and told her "I know more than you do."  He told her not to talk over him, although he was the one talking over her.  He did not make these or other belittling comments to the male doctor.

133.     Harry also told Relator she was "a drain on the practice" because she was not submitting her patient notes "on time."  By contrast, Harry failed to submit patient notes for more than one year.  Again, Harry did not make these or other belittling comments to the male doctor.

134.     BFF treated Relator adversely to a less qualified and experienced male doctor in terms of pay, benefits, job opportunities and overall work environment.

135.     Relator's gender was a motivating factor for BFF's adverse treatment of Relator.

**Q.  Docking of Pay in General.**

136.     As a physician, Relator was a professional employee of BFF.

137.     Relator was paid a salary by BFF.

138.     Relator was not paid overtime for hours beyond forty (40) in any week of employment with BFF.

139.    BFF docked Relator's salary because BFF had not yet obtained Relator's medical credentials with the States of Missouri and Illinois.

140.    BFF further docked Relator's salary when Relator was absent due to illness.

141.    BFF did not have a bona fide plan, policy or practice providing that a professional employee who was absent for illness lost salary.

**R. Disability Discrimination.**

142.    Relator is an individual with a disability under the Missouri Human Rights Act because she has a bone disorder that left her with deformed hips that had to be replaced in 2005, and because she has mast cell activation disorder, causing her to go into anti-phylactic shock from random triggers including stress.

143.    Relator's bone disorder significantly impairs her mobility, a major life activity.

144.    Relator's mast cell activation disorder significantly impairs one or more major life activities because it requires her to have a box in her chest to assist with life-sustaining medication, it causes her to have clotting issues, and because her manual dexterity is limited by the amputation of one finger, *inter alia,* requiring her to use a surgical assistant for her work.

145.    Relator's mast cell activation disorder further significantly impairs the major life activity of reproduction because it precludes her from taking birth control pills and causes her clotting issues.

146.    Relator's mast cell activation disorder is largely mitigated for work purposes by a compound medication that she was taking at the time she began working for Harry.

147.    Without medical mitigation, Relator's disorder further significantly impairs one or more major life activities because anaphylactic shock is life-threatening.  Since commencing work with BFF and losing the health insurance that was necessary for her to obtain the

22

compound medication necessary to treat her disorder, Relator has been in an intensive care unit and on a respirator multiple times.

148.     Relator is a qualified individual with a disability because she can perform the essential functions of her position as a foot surgeon with reasonable accommodation.

149.     Relator requested the use of any of BFF's medical assistants in procedures as a reasonable accommodation for her limited dexterity caused by her amputated finger.

150.     Harry rejected Relator's accommodation request and failed and refused to conduct an interactive process to determine one or more reasonable accommodations to her disabilities.

151.     When Relator was relaying to Harry clinical information about her disabilities for the purpose of insuring he was fully informed, Harry ridiculed Relator by saying something to the effect of "Oh, you have to be super careful when you have sex" and by subsequently calling her "Typhoid Mary."

152.     As described in more detail below, Harry refused to provide Relator with group health insurance.

153.     Harry's actions of failing to accommodate Relator's disabilities, failing to engage in an interactive process concerning accommodation and refusing Relator group health coverage provided to others were motivated, at least in part, by Relator's disabilities.

154.     A reasonable person in the same or similar circumstances as Relator would have felt compelled to leave Harry's employment.

**S.  Interference with Right to Group Health Coverage.**

155.     BFF provides group health insurance governed by ERISA which it offered to its full-time employees.

156.    Harry was aware that Relator needed health insurance due to her chronic disabling conditions.

157.    Relator was improperly denied group health insurance throughout her employment.  On information and belief, all other employees of BFF were offered group health insurance within their first ninety (90) days of employment.

158.    As a result of BFF's actions, Relator was unable to obtain health insurance and therefore could not afford the life-saving compound medication that prevents her from going into anti-phylactic shock and therefore was intubated and placed on life support twice in her final month of employment with BFF.

**T.  Relator Brings Violations to Harry's Attention**

159.    Throughout her employment, Relator tried to raise all of the above-referenced issues (overbilling, mis-coding, recordkeeping deficiencies, failure to prescribe home health care, non-compliance with sterile surgical practices, HIPPA violations and over-prescribing of durable medical equipment) with Harry.

160.    Relator's moral conscience and reasonable fear of being accused of participating in Harry's fraud caused her to continue to bring these serious matters to Defendants' attention throughout the remainder of her employment.

161.    A medical assistant, Lisa Hamilton, responded to the issues Relator raised about the lack of sterile surgical procedures by ordering sterile gloves and drapes, and attempting to improve the process (including requiring employees to wash their hands and using a medical assistant in surgery to sterilize equipment).

162.    Despite the efforts of Relator and Hamilton, BFF failed to fix these violations.

24

163.    Harry fired Hamilton without notice and then fraudulently stated that she had resigned.

164.    BFF retaliated against Relator for repeatedly raising these issues.  For example, Harry counseled her for billing accurately because her billing codes did not pay as well.

165.    On information and belief, another example of BFF's retaliation against Relator is refusing to provide her with group health insurance that it provided to all other employees.

166.    Another example of BFF's retaliation against Relator is failing to get her credentialed so she was unable to perform complex surgeries.

167.    Another example of BFF retaliating against Relator is her assignment to work only in the office and nursing homes, while assigning the newer male physician to work with him at a hospital.

168.    As a result of BFF's continuing unremedied violations described above, Relator was emotionally beaten down, demoralized and fearful of being accused of participating in Harry's unlawful conduct, so that she felt compelled to quit working for Harry.  Relator gave written notice of resignation on August 26, 2021.

169.    A reasonable person in the same or similar situation would have felt compelled to leave BFF's employment.

## CLAIMS

## COUNT I

**Violation of False Claims Act § 3729 *et seq*.**
**Providing and Billing for Services while in Noncompliance with the Medicare and Medicaid Conditions of Participation**

170.    Relator realleges and incorporates each of the preceding paragraphs as though fully set forth herein.

171.    Defendants falsely certified that they were in compliance with CMS requirements when seeking reimbursement from the Government for podiatry services.

172.    Harry billed for and provided services that were not medically necessary.

173.    In addition, Defendants billed for and provided services for which they were not entitled to bill Medicare and Medicaid.

174.    Defendants billed for and provided services while not in compliance with the Health Insurance Portability and Accountability Act of 1996 and applicable rules regarding recordkeeping.

175.    Defendants billed for services while in noncompliance with applicable rules regarding cleanliness and the maintenance of patient-care equipment.

176.    By virtue of the acts described above, Defendants knowingly, or by reckless disregard or deliberate ignorance, failed to comply with statutory, regulatory, and CMS requirements as a condition for reimbursement when submitting claims for the podiatry services provided, and therefore presented false or fraudulent claims to the United States Government for payment or approval.

177.    The Government, unaware of the noncompliance of the claims for reimbursement made or caused to be made by Defendants, paid and continues to pay claims that would not be paid were Defendants' unlawful conduct known to the United States. Defendants' false certification of compliance was material to the Government's decision to pay.

178.    By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and will continue to be damaged.

WHEREFORE, Relator respectfully asks this Court to enter judgment against Defendants in accordance with the following:

26

(a)      That Defendants be ordered to cease and desist from submitting and/or causing to be submitted any additional false claims or otherwise violating 31 U.S.C. §§ 3729 *et seq.*;

(b)      That civil penalties be imposed of not less than Five Thousand ($5,000.00) Dollars nor more than Ten Thousand ($10,000.00) Dollars for each and every false claim presented to the United States, multiplied as provided by 31 U.S.C. §§ 3729 *et seq.*;

(c)      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d)      That judgment be entered for Relator and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees, costs, and expenses which Relator incurred in bringing this case;

(e)      That pre- and post-judgment interests be awarded;

(f)      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this complaint; and

(g)      For such other and further relief as the Court deems just and proper under the circumstances.

## COUNT II

### Violation of False Claims Act § 3729 *et. seq.*
### Submission of False Statements

179.      Relator realleges and incorporates each of the preceding paragraphs as though fully set forth herein.

180.      Through the acts described above, Defendants knowingly presented or caused to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved.

27

181.    This included billing for procedures that were not provided, "upcoding," and providing and billing for medically unnecessary procedures.

182.    Defendants falsely and fraudulently modified billing claims to receive higher reimbursement than it was entitled to. Defendants then presented, or caused to be presented, these false billing claims to the Government for payment or approval.

183.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid were Defendants' unlawful conduct known to the United States.

184.    By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and will continue to be damaged.

WHEREFORE, Relator respectfully asks this Court to enter judgment against Defendants in accordance with the following:

(a)    That Defendants be ordered to cease and desist from submitting and/or causing to be submitted any additional false claims or otherwise violating 31 U.S.C. §§ 3729 *et seq.*;

(b)    That civil penalties be imposed of not less than Five Thousand ($5,000.00) Dollars nor more than Ten Thousand ($10,000.00) Dollars for each and every false claim presented to the United States, multiplied as provided by 31 U.S.C. §§ 3729 *et seq.*;

(c)    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d)    That judgment be entered for Relator and against Defendants for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees, costs, and expenses which Relator incurred in bringing this case;

(e)    That pre- and post-judgment interests be awarded;

28

(f)     That the Court grant permanent injunctive relief to prevent any recurrence of the

False Claims Act violations for which redress is sought in this complaint; and

(g)     For such other and further relief as the Court deems just and proper under the

circumstances.

## COUNT III

### Violations of the Missouri Human Rights Act, R.S.Mo. §213.055(1)
### Sexual Harassment

185.    Relator re-alleges and incorporates each of the preceding paragraphs as though

fully set forth herein.

186.    Harry attempted to force Relator into a *quid pro quo* sexual relationship with him

in violation of R.S.Mo. §213.055(1).

187.    BFF, through Harry and Liebermann, also subjected Relator to a pervasive

sexually hostile work environment that would be intimidating, hostile or offensive to a

reasonable person in violation of R.S.Mo. §213.055(1).

188.    Relator's gender was a motivating factor in her adverse treatment by Harry and

BFF.

189.    As a result of BFF's violations of the MHRA, Relator is entitled to an award of

back pay, interest on back pay, front pay, the value of lost past and future employment benefits,

and other appropriate equitable relief pursuant to R.S.Mo. §213.111(2).  Reinstatement of

Relator to her former employment with BFF is not feasible.

190.    As a result of BFF's violations of the MHRA, Relator is further entitled to recover

compensatory damages for future pecuniary losses, physical and emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses pursuant

to R.S.Mo. §213.111(2).

191.    Defendants engaged in the referenced discriminatory practices with malice or reckless indifference to Relator's State protected rights.  Accordingly, Relator is entitled to an award of punitive damages in an amount to be determined by the jury pursuant to R.S.Mo. §213.111(2).

192.    Relator is entitled to recover reasonable attorney and expert fees and court costs pursuant to R.S.Mo. §213.111(2).

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendant BFF, in accordance with the following:

a.    That judgment be entered for Relator and against BFF for such damages as are fair and reasonable, including lost wages and other benefits of employment,

b.    That judgment be entered for Relator and against BFF for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the MHRA,

c.    That judgment be entered for Relator and against BFF for punitive damages for its willful violations of Relator's rights under the MHRA,

d.    That judgment be entered for Relator and against BFF for pre-judgment and post-judgment interest,

e.    That judgment be entered for Relator and against BFF for attorney's fees and costs, and

f.    For such additional relief as may be just and proper under the circumstances.

## COUNT IV

**Violation of the Missouri Human Rights Act, R.S.Mo. §213.070(2)**
**Retaliation**

193.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

30

194.    Harry attempted to force Relator into a *quid pro quo* sexual relationship with him in violation of R.S.Mo. §213.055(1).

195.    When she rejected these attempts, Harry, as the sole principal of BFF, retaliated against Relator in violation of R.S.Mo. §213.070(2) by directing her to meet at the office until 2 a.m. to prepare billing, establishing false deadlines for her charting, refusing to let her conduct complex surgeries or obtain hospital privileges, complaining about her honest and accurate coding of billing, docking her salary for sick leave, failing to get her credentialed and then docking her salary because she was not credentialed, and refusing to provide her with health insurance benefits that were routinely provided much earlier to other employees.

196.    Relator's opposition to Harry's attempts to force her into a sexual relationship and to BFF's sexually hostile work environment motivated, in whole or in part, Defendants' subsequent adverse actions against Relator.

197.    As a result of Defendants' violation of the MHRA, Relator is entitled to an award of back pay, interest on back pay, front pay, the value of lost past and future employment benefits, and other appropriate equitable relief pursuant to R.S.Mo. §213.111(2).  Reinstatement of Relator to her former employment with BFF is not feasible.

198.    As a result of Defendants' violation of the MHRA, Relator is further entitled to recover compensatory damages for future pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses pursuant to R.S.Mo. §213.111(2).

199.    Defendants engaged in the referenced discriminatory practices with malice or reckless indifference to Relator's State protected rights.  Accordingly, Relator is entitled to an

award of punitive damages in an amount to be determined by the jury pursuant to R.S.Mo. §213.111(2).

200.    Relator is entitled to recover reasonable attorney and expert fees and court costs pursuant to R.S.Mo. §213.111(2).

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendant BFF, in accordance with the following:

a.     That judgment be entered for Relator and against BFF for such damages as are fair and reasonable, including lost wages and other benefits of employment,

b.     That judgment be entered for Relator and against BFF for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the MHRA,

c.     That judgment be entered for Relator and against BFF for punitive damages for its willful violations of Relator's rights under the MHRA,

d.     That judgment be entered for Relator and against BFF for pre-judgment and post-judgment interest,

e.     That judgment be entered for Relator and against BFF for attorney's fees and costs, and

f.     For such additional relief as may be just and proper under the circumstances.

## COUNT V

### Violation of the Missouri Human Rights Act
### Gender Discrimination

201.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

202.    Harry treated Relator adversely to a less qualified and experienced male doctor in terms of pay, benefits, job opportunities and overall work environment.

32

203.    Relator's gender was a motivating factor for Harry's adverse treatment of Relator.

204.    As a result of Defendant's violation of the MHRA, Relator is entitled to an award of back pay, interest on back pay, front pay, the value of lost past and future employment benefits, and other appropriate equitable relief pursuant to R.S.Mo. §213.111(2).  Reinstatement of Relator to her former employment with BFF is not feasible.

205.    As a result of Defendants' violation of the MHRA, Relator is further entitled to recover compensatory damages for future pecuniary losses, physical and emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses pursuant to R.S.Mo. §213.111(2).

206.    Defendants engaged in the referenced discriminatory practices with malice or reckless indifference to Relator's State protected rights.  Accordingly, Relator is entitled to an award of punitive damages in an amount to be determined by the jury pursuant to R.S.Mo. §213.111(2).

207.    Relator is entitled to recover reasonable attorney and expert fees and court costs pursuant to R.S.Mo. §213.111(2).

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendant BFF, in accordance with the following:

a.      That judgment be entered for Relator and against BFF for such damages as are fair and reasonable, including lost wages and other benefits of employment,

b.      That judgment be entered for Relator and against BFF for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the MHRA,

c.      That judgment be entered for Relator and against BFF for punitive damages for its willful violations of Relator's rights under the MHRA,

33

      d.        That judgment be entered for Relator and against BFF for pre-judgment and post-judgment interest,

      e.        That judgment be entered for Relator and against BFF for attorney's fees and costs, and

      f.        For such additional relief as may be just and proper under the circumstances.

## COUNT VI

### Violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1), *et seq*.

208.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

209.    Defendants knowingly paid Relator at a lesser rate than her male counterpart based solely on her gender although she was performing equal work on jobs which required equal skill, effort and responsibility under the same or similar working conditions. This conduct of Defendants is violative of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

210.    As a result of this willful violation of the Equal Pay Act, Relator is entitled to recover an award of back pay pursuant to 29 U.S.C. §§ 206(d)(1) and 216(b), consisting of the difference in the compensation which she earned as a woman and the compensation that she would have earned for equal work if she had been a man. Relator is further entitled to interest on that back pay award.

211.    As a result of Defendants' violation of the Equal Pay Act, Relator is additionally entitled to recover liquidated damages in an amount equal to the back pay award pursuant to 29 U.S.C. §§ 206(d)(1), 216(b).

212.    Relator is entitled to recover her reasonable attorney fees and costs pursuant to 29 U.S.C. §§ 206(d)(1), 216(b).

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendants BFF and Harry, jointly and severally, in accordance with the following:

a.      That judgment be entered for Relator and against defendants for lost pay, including overtime pay, plus liquidated damages thereon for Defendants' EPA violations;

b.      That judgment be entered for Relator and against Defendants for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the EPA;

c.      That judgment be entered for Relator and against Defendants for pre-judgment and post-judgment interest;

d.      That judgment be entered for Relator and against Defendants for attorney's fees and costs;

e.      That Defendants be fined, jointly and severally, for $10,000 for each willful violation of the EPA; and

f.      For such additional relief as may be just and proper under the circumstances.

## COUNT VII

**Violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §206, *et seq.***

213.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

214.    Relator was an exempt, salaried professional employee of BFF.

215.    Defendants improperly docked Relator's salary because Defendants had not yet obtained her medical credentials with the State of Missouri.

216.    Defendants further improperly docked Relator's salary when Relator was absent due to illness, because there was not a bona fide plan, policy or practice for loss of salary in such circumstance.

217.    Pursuant to 29 U.S.C. §§ 206, Relator is entitled to reimbursement for her complete salary for each week of her employment.  Relator is further entitled to interest on that back pay award.

218.    Alternatively, pursuant to 29 U.S.C. § 207(a), Relator is entitled to overtime ay at one and one-half times her hourly pay for all hours over forty (40) that she worked in each week of her employment, plus interest on that overtime pay award.

219.    Pursuant to 29 U.S.C. § 216(b), in either case, Relator is also entitled to recover liquidated damages in an amount equal to the back pay award.

220.    Relator is entitled to recover her reasonable attorney fees and costs pursuant to 29 U.S.C. § 216(b).

221.    Pursuant to 29 USC § 216(a), Defendants may be fined up to $10,000 for its willful violation of the Fair Labor Standards Act.

222.    Pursuant to 29 USC § 207 and 216(c)(2), Defendants may be fined up to $1,100.00 for each violation.

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendants BFF and Harry, jointly and severally, in accordance with the following:

a.      That judgment be entered for Relator and against Defendants for lost pay, including overtime pay, plus liquidated damages thereon for Defendants' FLSA violations;

b.      That judgment be entered for Relator and against Defendants for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the FLSA;

c.      That judgment be entered for Relator and against Defendants for pre-judgment and post-judgment interest;

d.      That judgment be entered for Relator and against Defendants for attorney's fees and costs;

e.      That Defendants be fined, jointly and severally, for $1,100 for each violation of the FLSA; and

f.      For such additional relief as may be just and proper under the circumstances.

## COUNT VIII

### Violation of the Missouri Human Rights Act
### Disability Discrimination

223.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

224.    Relator is a qualified individual with a disability, because she is chronically disabled in a manner that significantly impairs one or more major life activities and she is able to perform the essential functions of her job with reasonable accommodation.

225.    Defendants refused to provide a reasonable accommodation for Relator's reduced manual dexterity, despite understanding the reason for the request.

226.    Defendants did not engage in an interactive discussion with Relator over her requested accommodation.

37

227.    Defendants violated Relator's state protected rights by failing and refusing to reasonably accommodate the amputation of a finger through the use of any medical assistant during procedures, or in any other manner.

228.    Defendants violated Relator's state protected rights by failing and refusing to engage in an interactive process to determine one or more reasonable accommodations for her disabilities.

229.    Defendants violated Relator's state protected rights by constructively discharging her motivated, at least in part, because of her disabilities.

230.    The unlawful employment practices complained of above were intentional.

231.    As a result of Defendants' refusal to reasonably accommodated Relator, she is entitled to recover compensatory damages for the loss of wages and benefits, loss of job opportunity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses pursuant to R.S.Mo. §213.111(2). Reinstatement of Relator to her former employment with BFF is not feasible.

232.    As a result of Defendants' discriminatory constructive termination of Relator, she is entitled to recover compensatory damages for the loss of wages and benefits, loss of job opportunity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, attorney fees and costs, and other nonpecuniary losses pursuant to R.S.Mo. §213.111(2).

233.    The unlawful employment practices complained of above were done with malice and reckless indifference to the state protected rights of Relator. Accordingly, Relator is entitled to recover reasonable attorney and expert fees and court costs pursuant to R.S.Mo. §213.111(2).

a.      WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendant BFF, in accordance with the following:

38

b.      That judgment be entered for Relator and against BFF for such damages as are fair and reasonable, including lost wages and other benefits of employment,

c.      That judgment be entered for Relator and against BFF for compensatory damages for physical and emotional distress caused by Defendants' actions in violation of the MHRA,

d.      That judgment be entered for Relator and against BFF for punitive damages for its willful violations of Relator's rights under the MHRA,

e.      That judgment be entered for Relator and against BFF for pre-judgment and post-judgment interest,

f.      That judgment be entered for Relator and against BFF for attorney's fees and costs, and

g.      For such additional relief as may be just and proper under the circumstances.

## COUNT IX

**Violations of the Employee Retirement Income Security Act of 1974, 29 USC § 1140, *et seq.*
Interference with Customary Provision of Health Coverage**

234.    Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

235.    Relator was a full-time employee of BFF.

236.    Relator was one of three full-time physicians employed by BFF.

237.    On information and belief, BFF customarily provided paid group health insurance to its full-time employees within their first ninety (90) days of employment.

238.    On information and belief, Harry, as the owner and administrator of BFF, made all decisions about who was provided paid group health insurance.

239.    Despite Relator's frequent inquiries concerning the status of her health insurance coverage, BFF and Harry failed and refused to provide Relator with paid group health insurance, although she worked for BFF for more than five months.

240.    On information and belief, the male physician hired after Relator was provided paid group health insurance within his first 90 days of employment.

241.    BFF and Harry never provided group health insurance to Relator, knowingly interfering with her right to the health insurance benefits of her employment in violation of 29 U.S.C. §1140.

242.    Relator was injured by these actions by not having insurance that would cover her necessary medication and, as a direct result, suffering anti-phylactic shock multiple times and being placed in intensive care and on life support.

243.    Pursuant to 29 U.S.C. §1132(a)(3), a/k/a ERISA 502(a)(3), Relator is entitled to equitable relief to compensate her for Defendants' interference with her right to group health coverage, including make-whole relief in the form of a surcharge.

244.    Pursuant to 29 U.S.C. §1132(g)(1), Relator is entitled to attorney fees and costs.

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendants BFF and Harry, jointly and severally, in accordance with the following:

g.    That judgment be entered for Relator and against Defendants for such damages as are fair and reasonable, including reimbursement of medical expenses as though she had been covered by BFF's group health insurance plan;

h.   That judgment be entered for Relator and against Defendants for a surcharge/compensatory damages for physical and emotional distress caused by Defendants' actions in violation of ERISA;

i.   That judgment be entered for Relator and against Defendants for pre-judgment and post-judgment interest,

j.   That judgment be entered for Relator and against Defendants for attorney's fees and costs, and

k.   For such additional relief as may be just and proper under the circumstances.

## COUNT X

### Violation of False Claims Act § 3730 *et seq.*
### Retaliation for Whistleblowing

245.   Relator re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

246.   Relator engaged in protected action under the False Claims Act when she repeatedly brought to Harry's attention problems with overbilling, mis-coding, recordkeeping deficiencies, failure to prescribe home health care, non-compliance with sterile surgical practices, and over-prescribing of durable medical equipment.

247.   Thereafter, Relator was counseled for bringing such complaints.

248.   Moreover, Relator was denied health insurance coverage provided to all other employees of BFF.

249.   Defendants' actions toward Relator were motivated by retaliation because of her attempts to address its FCA violations.

250.   Defendants' actions toward Relator were willful.

41

251.   Relator was constructively discharged by Defendants' adverse actions toward her and by its failure to cure its FCA violations.

252.   Relator was discriminated against in the terms and conditions of her employment because of lawful acts done by her to stop Defendants' violations of 31 U.S.C. § 3730 *et seq.*

253.   Relator was harmed by this adverse action by not being able to obtain group health insurance coverage.

WHEREFORE, Relator respectfully asks this Court to enter judgment in her favor, individually, and against defendants BFF and Harry, jointly and severally, for all damages necessary and appropriate pursuant to 31 U.S.C. §3703(h), including the following :

a.      That judgment be entered for Relator and against defendants for such damages as are fair and reasonable, including lost wages and other benefits of employment,

b.      That judgment be entered for Relator and against defendants for compensatory damages for physical and emotional distress caused by Defendants' constructive discharge of Relator,

c.      That judgment be entered for Relator and against defendants for punitive damages for its willful retaliation against Relator;

d.      That judgment be entered for Relator and against defendants for pre-judgment and post-judgment interest,

e.      That judgment be entered for Relator and against defendants for attorney's fees and costs, and

f.      For such additional relief as may be just and proper under the circumstances, including for reimbursement of medical expenses she incurred because she was unlawfully denied group health insurance.

Dated:  11/18/21                          Respectfully submitted,

                                          **THE SIMON LAW FIRM, P.C.**


                                          */s/  Paul J. Tahan*_____
                                          Anthony G. Simon, #MO38745
                                          Paul J. Tahan, #MO73037
                                          800 Market Street, Suite 1700
                                          St. Louis, Missouri 63101
                                          P. (314) 241-2929
                                          Fax (314) 241-2029
                                          asimon@simonlawpc.com
                                          ptahan@simonlawpc.com


                                          **WORKERS RIGHTS LAW FIRM LLC**


                                          */s/ Sherrie A. Hall*_____
                                          SHERRIE A. HALL, #MO40949
                                          2258 Grissom Drive
                                          St. Louis, Missouri 63146
                                          Phone: (314) 824-0348
                                          Fax:     (314) 828-1029
                                          sherrieworkersrights@gmail.com

                                          ***Attorneys for Relator***